People for the Ethical Treatment of Animals and Others v. Miami Sea Aquarium Ms. Winders? Yes, good morning, Your Honor. May it please the Court, Delciana Winders for the appellants. This case is about Lolita, a highly intelligent orca who the Miami Seaquarium confines to a small, shallow, barren concrete tank, without the company of a single other orca but with dolphins who attack and injure her, and without adequate protection from the sun. Even as compared to other orcas in captivity, Lolita is unable to swim any meaningful distance, dive, or carry out virtually any of her natural behaviors. The District Court recognized expressly that these conditions in fact harm and harass Lolita, which is strictly prohibited by the plain language of the Endangered Species Act, yet it nevertheless granted summary judgment to the Seaquarium. The District Court was only able to do so by ignoring the plain language of the Endangered Species Act and manufacturing a limiting factor on its take prohibition. The Court erroneously held that Lolita is only entitled to the protections of the Endangered Species Act if she is, quote, gravely harmed or harassed. The grave harm standard that the District Court manufactured cabins the Endangered Species Act take prohibition in contravention of the Act's plain language, in contravention of the legislative history, Supreme Court precedent, and longstanding agency practice. In addition, in applying this improper standard, the Court then compounded her error by separately airing and disregarding material disputes of fact about Lolita's conditions and severity of her injuries. First, as to the improper standard, the District Court detailed 13 separate injuries to Lolita on which plaintiffs had proffered evidence, including physical and psychological injuries caused by her inability to engage in normal swimming or diving behaviors, as the Court recognized even as compared to other captive orcas. In addition, having to have a tooth painfully drilled many times, confinement with incompatible dolphins who frequently attack and... which are attended to by a veterinarian. In your remedy, you would put her out in some kind of very large net enclosure out in the ocean, and I don't understand how she would get the veterinary services she needs. Can you explain to me the remedy and how it's going to solve the problems that you see? Yes, Your Honor. So, first, the remedy, of course, has not been visited by the District Court, so that is not at issue yet. There are a number of different... She must be proposing something, otherwise you wouldn't have brought a suit. I mean, there's no purpose. Yes. PETA and the other appellants are urging for Lolita to be transported to a seaside sanctuary, a pen where she is still technically in captivity, but she has months more space. She is able to communicate with her family, and she is still supervised by veterinarians, behaviorists. How big is the pen, and where is it? The pen is near the Puget Sound, where she was taken from, and I can check on the exact measurements of the pen. It's vastly larger than the tank she's in. It's not 100 square miles? It's not 100 square miles, Your Honor. I mean, you're telling me she can see her veterinarian regularly there. Yeah. To be clear, a couple other points. I mean, that is not the only possible remedy here. The Court could certainly order the Seaquarium to come into compliance with the requirements of the Endangered Species Act and keep her there. The Court could also require them to apply for a permit, and that was discussed in the listing decision. That's one option for someone who wants to engage in otherwise prohibited activities. I want to follow up on Judge Rastani's question. I look back at it, because in the blue brief, you ask to remand to the District Court for further proceedings, so I look to see what you ask the District Court to do. And I think the question was, where is the sea pen, and has the sea pen been built? The sea pen has not been built. The plans are very detailed. The entire plan for the pen is in place. The pen is in Washington, on the waters where Lolita's family is located. Tomorrow, she could be transported to an unfinished pen? She would not be transported before it were completed. It would be completed if there were an order to transfer her there. She would, of course, need to have her health assessed and make sure she's ready for transport, and then she could be transported to the pen once it's completed. How would you transport Lolita? There is a transport plan in place, and there are numerous experts. Slings are typically used. Orcas are transported. SeaWorld has sent numerous orcas to Spain, for example, to another facility. So there are industry practices, and there is a plan in place. Is transporting to Spain done before the species came under the Endangered Species Act? Lolita is the only captive orca who is protected by the Endangered Species Act. And transportation happens before? Those orcas are not covered by the Endangered Species Act. So we would consult with NMFS, and if NMFS thought it was necessary to obtain a permit for that transport, we would go through that process. So it's your position that releasing a captive animal into the wild would not result in a violation of the ESA? We do not take a position on that, and NMFS has not taken a position on that either. They very clearly said in their final listing decision— But that's a remedy you want. We're not asking for Lolita to be released into the wild. There's a distinction between being in a CPEN where she can be carefully monitored, where there's a large expert staff to look after her and make sure her needs are met, and just releasing an animal into the wild. So you have all the money ready to build the CPEN, and you have plans to start building it when? The plans are to build it if and when there is an order to allow Lolita to be released. You have all the money ready to build the CPEN? There are a number of organizations. Yes, the funding is secured for the CPEN. You said Lolita is the only captive orca covered by the ESA. Why is that? Because of the grandfather provision or something? No, there's no grandfather provision for take of captive animals out of the ESA. Lolita is from a critically endangered population of orcas. There are only a few dozen other orcas in her population. So that is why. So she is the only one in current captivity that's covered by the ESA? Yes, that's correct. As to the point about Lolita— Where are the other, you say, few dozen orcas that you say are in her population group? Yes, her pod and the broader southern resident killer whale population. Where are they? They're in Washington, in the waters of Washington. But not in the CPEN? Not in the CPEN, but they do swim by the area where the CPEN is, so it's believed she would be able to communicate with them. It's also believed that her mother is still alive, which goes to the point I wanted to get back to about her lifespan. The record shows that female orcas can live up to 90. It's not in the record, but another female orca recently lived to 110 years old. So Lolita is certainly nowhere near her lifespan. I think the numbers are a bit skewed because there's a high infant mortality rate of orcas. But she has, of course, survived infancy and has many good years ahead of her if she's released into conditions where she can be properly cared for and swim and dive and act like an orca. We need to know how big this pen is. Isn't that kind of key? She's been in captivity forever. She's been getting all this veterinary care. We would have to know that she could get that care, according to the things that you've listed and that the judge has accepted. Yeah, I would be happy to submit a supplemental filing on this detailed plan that is in place and the plans for her to get care. Is that plan in the current record? Yes, Your Honor. Give me just one second. If you don't know right now, you can write us a note afterwards. Okay, thank you. Yeah, we'll pull it. I'll either get it to you now or on rebuttal. Counsel can stay and then you all can just write a handout, write the plan is in the record, add document, so-and-so. The plan is not in the record. Okay. We'll do that before you leave so we know. Can I ask you about the statutory? Yes, go ahead. It seems to me that the judge felt that he was confronted with several different statutory schemes, and the judge was trying to make them work in the current material. And you think he should have done what, the function of the schemes that are, I guess, under the Department of Agriculture? Yes, the judge perceived a conflict between the Federal Animal Welfare Act, which is enforced by the Department of Agriculture. We believe that the Supreme Court's decision in Palm Wonderful versus Coca-Cola is on all fours here, and that is where you have two separate complementary statutes that have different scopes and purposes. They must be read to give full effect to the terms of each, unless there is a clear conflict between the two. And there is no conflict between the Animal Welfare Act and the Endangered Species Act. In fact, entities have been regulated, entities with captive animals have been regulated by both statutes for decades, and what the district court's decision would do by manufacturing a conflict would disrupt long-standing agency practices as to how to regulate under both of these statutes. So to go to the language in Palm Wonderful, the Supreme Court said, quote, when two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended on one statute to preclude the operation of the other. And here, as in Palm Wonderful, there is nothing in the statutory structure or the empirical evidence that shows there is any difficulty in fully enforcing both statutes according to their terms. As I said, they have been fully in effect for decades. The agencies have developed practices. For example, the U.S. Fish and Wildlife references, but does not entirely rely on Animal Welfare Act compliance in determining whether an animal has been harassed. But in doing so, they're also careful to not make that the only factor. They also look at whether the practice that may be harassment is, quote, unquote, generally accepted. And the Fourth Circuit very recently, in a case called Hill v. Coggins, which involved bears in very similar conditions to Lolita, stressed that mere Animal Welfare Act compliance isn't sufficient under the ESA. You also must have a practice that is generally accepted. And I submit that where the Seaquarium's own experts testified that they have never known another orca to be in a tank this tiny or another orca to be deprived of companionship for so many decades. These are not generally accepted practices. And the district court had a duty to examine all of that. Okay, your time has expired unless the panel has questions. Thank you, Ms. Winders. Mr. Shurker. Thank you, Your Honor. May it please the court, Elliot Shurker on behalf of the Appalese. I think I can answer most of the court's questions about the plan, quote, unquote, plan, and the district court's ruling. I refer the court to page 17 of our brief, footnote 9, and the citations to the record are where the plaintiffs have demanded that Lolita be forfeited and transferred to the Sea Pen, a record 127 and record 164. Lolita's been in human captivity for 46 years, and the plan is to transport her 3,000 miles to an unbuilt and yet unfunded Sea Pen. And I say unfunded because I refer the court to the summary judgment papers, which is record 127, page 10, number 80, where we assert as an undisputed fact none of the plaintiffs have obtained or sought commitments from donors to support the cost of moving Lolita, referred to here as Toki, the other name, to a Sea Pen and caring for her in a Sea Pen. That's number 80. And in response to number 80, which is record 164, the plaintiffs respond undisputed. So there's no funding. There's no pen. The proposed Sea Pen, the unbuilt and unfunded Sea Pen, by the way, I also note there are no plans to provide a companion animal, a companion orca, and the reason for that is there are no other orcas in captivity, and it is unlawful to take an orca, which transporting an animal 3,000 miles, the NFMS considers, NMFS considers, is also considered to be a possible take by transporting the animal. The Sea Pen that they propose doesn't even meet their 100-by-100-mile dimensions that their so-called experts set as the first step of the plan, referring the court to record 127, record 164, and the district court order, which is record 203 at page 6. As we also note in our brief, transporting a marine animal who's been in captivity for more than two years, such an animal is presumptively non-releasable, so it would violate that presumption. So we have an unfunded, unbuilt Sea Pen. It's impossible to provide a companion animal because you can't take an orca. What is the plan for the size of the Sea Pen? Judge, I don't believe I have a record site for how big they say it will be, but it won't be as big as they say it should be, which is 100-by-100-miles. Shut up. And it would be very difficult to make a house call. Let me ask you about the transportation. You said it would be a taking, I guess, or violate the ESA to transport, but can they get a license? I assume they can get a take license. If we're going to play this out to the extreme, they could conceivably get a take license, but it would be up to the government to determine whether it's appropriate to take an animal that's been in captivity for 46 years, transport the animal 3,000 miles, and essentially, for lack of a better way to put it, drop her into the middle of the ocean. I would be surprised if that kind of permit could ever be issued. Those record facts are very helpful. Well, can you now go to the statutory scheme and how you walk through it and get to your whatever conclusion you're asking the court to make? Yes, Your Honor, and we believe that the . . . You've got the AWA, we've got the ESA. What language and how do you walk through? If you were to say how it should work, how do you claim it should work? Well, there's two steps to the analysis. The first was the district court's analysis of the ESA itself and the meaning of harass and harm in the context of all those many words that the Congress used to describe a take. And, of course, the Congress used words that have similar meaning, that overlap. The Supreme Court said in Sweet Home that they overlap because the Congress wanted to make sure that there were no loopholes through which someone could slide to take an animal. And we know they're supposed to all kind of mean the same thing. Exactly. So what do you say harass and harm equal take? What do you say that has to be? Well, Judge, we rely, as the district court did, on the definitions given by the agencies themselves. And what the . . . So we're saying that they're taking the orca . . . They already have the orca, but they're taking the orca if they are harassed and harming the orca? Is that how it works? Within the meaning of those terms, as adopted by the agencies that are charged with enforcing the ESA. So I'd refer the court to 50 CFR 17.3, which is cited in our brief and relied on by the district court, which are the definitions under the ESA. Harass in the definition of take, quote, means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns, which include but are not limited to breeding, feeding, or sheltering. Now those, of course, are speaking to animals in the wild, and I'll get back to that in a minute. The definition of harm in that same CFR is an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing, again, essential behavioral patterns, including breeding, feeding, or sheltering. The difficulty is that an animal in captivity is by definition, to a large extent, prevented from the ordinary activities of breeding, feeding, and sheltering. So what the CFR also says is that the definition of harass when applied to captive wildlife does not include generally accepted animal husbandry practices that meet or exceed the minimum standards for facilities and care under the AWA. Also provision of veterinary care that's not likely to result in injury to the animal is exempted because both the agencies recognize that there's the need to harmonize the AWA, which was adopted in 1966 and applies only to captive wildlife, and the ESA, which was enacted some years later. And the agency has essentially done that for us because the agency says in their application of these two statutes, Judge Hall, that if you are engaging in care of a lawfully captive animal, you're complying with the AWA, which we undisputedly do on the face of this record. We're licensed. There are AWA inspections. And we can debate the size of the pool among experts or non-experts or people who care for whales, but it's been accepted by the AWA as appropriate treatment for this animal. Your argument, I think, is that if we give appropriate deference to the regulation, that there cannot be any harassment under the ESA because there's AWA compliance. Not exactly, and that's where the district court drew the balance. All right. The district court said the regulations recognize implicitly and to some extent explicitly that an animal being maintained under proper animal husbandry can nonetheless be injured. That's why the language says in the regulation intentional or negligent act or omission can be a take. So while an exhibitor may be fully compliant with the AWA, something can happen. Someone can make a mistake. An animal could be accidentally injured or essentially, for lack of a better word, malpractice, if you will, and that could be a take. So what the district court did in looking at all these words and in particular applying them to a captive animal in light of the agency's recognition that captive animals have to be treated differently under the ESA because they're already, quote-unquote, taken, if you will, and been captured or trapped or whatever word you could pluck out of the ESA, is all of the acts listed in the statute, by definition, involve something that threatens the life or habitat of an animal. And the reason for that is it's not plucked out of the air. The very purpose of the ESA, according to its legislative history, is to prevent extinction of endangered species and to prevent degradation of the habitat of endangered species. So all of the acts that are prohibited as take have to be construed in light of those purposes. So if you're killing an animal, you're intending toward extinction. If you're gravely injuring, if you're threatening to injure. So harm and harass cannot be defined as the bare minimum. As the district court said, there has to be some impact, some significant impact comparable to what those other words mean. That's just nociterososis and construing the words by the company they keep. But I would like to pause for a moment because I believe my opponent started her argument by saying the district court listed all of the injuries that have been inflicted upon this animal. Now the district court quite carefully set forth what the plaintiffs have proffered as their evidence of injury. And then at page 18 of the order, which is record 203, states as follows. Plaintiffs' evidence regarding Lolita's injuries are contained in four expert reports, three of which Sequoiam has moved to exclude under Rule 702. Because the court finds that as a matter of law, the injuries the plaintiffs have proffered do not constitute a take, the court need not address whether the proffered testimony satisfies the Daubert standard. However, the court has reviewed the reports and notes the absence of disclosures showing that the experts employed reliable methodologies for all or most of their opinions and that the experts' opinions regarding causation for many of the alleged injuries are speculative and unreliable. So the court said, I'll take what you've offered as your proffered evidence. As a matter of law, applying the gravely threatened standard, which arises from the very language of ESA Section 9 and from the very language employed by the agencies to enforce Section 9, does not rise to the level of gravely threatens. The court recognizes the possibility that an AWA-compliant exhibitor could nonetheless take a captive animal by injuring it. If a licensed, properly compliant exhibitor were to make some horrible mistake and an animal were to be severely injured or died, a take action could conceivably be brought. But in the general rule which the agencies themselves apply in harmonizing the AWA and the ESA is essentially this. There is no right to bring a private action under the AWA. There is no right to bring a private action under the AWA. I'm going to go back to page 18. I'm just looking at the middle sentence in that footnote 18. And the court states that because she finds that as a matter of law the injury plaintiffs have proffered do not constitute a take under the ESA. The court need not address the proffered testimony satisfies the Dauberts. Correct. That's exactly right. So there's never been a finding that any of these things are actual. This is what the plaintiffs have proffered. It didn't have to be tried or no Daubert determination needed to be made because it doesn't rise to the level of gravely threatened. Now, if I could refer the court also to the final pages of the district court's order. We're now at page 38. The district court gave this thoughtful and careful and detailed consideration. The court said the court has thoroughly considered the conditions and consequent injuries identified by the plaintiffs. Three categories the court identifies, physical and psychological injuries due to inadequate pool size, physical and psychological injuries due to the behavior by the dolphins, which are the closest companion animals that can be provided since there are no other orcas and can be no other orcas in captivity. And three, inappropriate veterinary care. This is what the court concluded. There is simply no evidence from the experts or otherwise that these conditions and concomitant injuries individually or collectively gravely threaten Olita's existence. Thus, while in a literal sense the conditions and injuries of which plaintiffs complain, not which are found to exist, are within the ambit of the ordinary meaning of harm and harass, it cannot be said that they rise to the level of grave harm that is required to constitute a take by a licensed exhibitor under the ESA. And what underlies all of this is, as I was starting to say, there's no right to private action under the AWA. To have these statutes operate in harmony, the courts are not going to allow an AWA action to be brought in an ESA package. If there's disagreement among experts but the AWA licenses the facilities, you can't do a de facto private action under the AWA by bringing an action and calling it a take unless you can satisfy the gravely threatened standard. And as the court concluded and as this court concluded in one of the earlier PETA decisions, the remedy is with Congress, not with the courts. Because otherwise, as the district court recognized, you substitute a district court judge for the expertise of the agency and allow any entity withstanding, and I haven't gotten to standing this morning, my opponent did not rely on our brief, but even assuming that they could present a case for organizational standing that simply disagrees with the AWA to bring an action against the licensed exhibitor and call it a take and require the ESA to serve the role that the AWA is supposed to serve. So the harmony between the two statutes starts with the meaning of the words and take and what the ESA is all about. And the agencies themselves, which as I read in reading from the regulations, will not consider ordinary, generally accepted animal husbandry under the compliant or exceeding the AWA to form the basis for a take. That's essentially all the district court held, and the decision should be upheld. Thank you. Judge, let me refer to the... Let me get the district court's order and answer with a record-based answer if I could. Thank you. I'm referring to the order at page 2, which is Record 203, pages 2 through 3. It's an oblong tank, which its widest point is 80 feet across and its lowest point is 20 feet deep. And at one point... Squared off at the edges, I think. There's some pictures in the record to which I can refer to the court, but bear in mind that at one... So the biggest dimension is 80 feet, so what's the other dimension? No, it's 80 feet across at the widest point. And I don't know that we have exact dimensions anyplace else. Apparently we do. Picture. This is Record 173-1, and it has all of the dimensions. Do you have the dimensions written on it? They're very small. It's 12 feet deep at the point where the other person stands. There are a couple of points where it slopes down from 12 feet to 20 feet, but it's all in this diagram. But bear in mind, Your Honor, that until that other orca died, the orca named Hugo died, they shared the tank. This was big enough at one point for two orcas to live in. Okay, and the AWA is the one who approves the IS thing? The agency has the unusual name of APHIS, A-P-H-I-S-S, which is the agency that's charged with enforcing the AWA and which licensed this facility and relicensed the facility. There was an unsuccessful challenge to that relicensing, but it came before this Court some years ago. So this was once shared by two very large marine mammals and now houses one and a few. There also is some barrier structure in the middle of the tank that comes down, if I recall correctly, that takes up some of the space in this tank. That's where the trainers stand. Yeah, but it still takes up some of the space. Takes up some space. But again . . . It's not an overly large tank. Let's just say that. Judge, the point is not whether it's overly large or not. I understand. I understand we have to look at what the law says. I understand. I think we have . . . do you want more? Mr. Shurker, thank you very much. Thank you. Time has expired. Now we'll hear from Ms. Winders. Thank you. As to Lolita's tank, I just want to stress, there's also a photo of her tank at page 164-13, Exhibit L in the record, and I think that illustrates very clearly. There is a large concrete barrier that goes all the way down and has gates that come up on either side. Lolita cannot swim through this barrier. Okay, just ask Mr. Shurker if he agrees that's in the record. We're going to look at all of them. Do you want to see that one? No, I found the page. You found the page? You got it on your computer? You got it? Yeah. Do you see the document? You know, if I were designing a pen, maybe I would design it differently. Maybe Sequarium would design it differently from the beginning. What am I going to do about AWA having rejected it and this court having upheld that? The district court was very clear in saying it was not deferring to any findings as to compliance by APHIS, and in fact acknowledged that appellants dispute whether in fact there is compliance. The record shows that there are very clear material disputes of fact as to whether the tank meets the minimum requirements of the Animal Welfare Act as well as whether the shade and social requirements are being met. I thought he said it was undisputed that this was AWA approved. It is absolutely disputed. And, in fact, we filed a Rule 28J letter with a recent USDA Office of Inspector General audit, which specifically speaks to Lolita's tank and says, quote, Well, why are they relicensing Sequarium then? The Animal Welfare Act licenses are automatically renewed regardless of compliance, and that's a case I actually argued. Yeah, we're familiar with that. Yeah, so that is why they're relicensing. They disregard compliance at the time of licensing. So there are clearly disputes of fact as to whether they are complying with the Animal Welfare Act. Don't you have an APA remedy to pursue under the ADA through the department to challenge that? You were doing that, and we kind of defer. Are you still ongoing in that AWA challenge? We have a separate pending challenge to the approval of Sequarium as a new site under Palace Entertainment's Animal Welfare Act license. But, again, going back to Palm Wonderful, the ESA and the Animal Welfare Act are two separate statutory schemes. They do overlap, and the agencies have found ways to address that. And that's the regulation he cites. I want to clarify a bit because I think he misrepresented that regulation. First of all, that's a fish and wildlife regulation. That is not a National Marine Fisheries Service regulation. National Marine Fisheries has jurisdiction over orcas and most other marine animals. They have an analogous definition of harm, which includes injury, any injury. It does not require a grave injury. So there is no reference in either fish and wildlife or NMFSA's regulation defining harm to Animal Welfare Act compliance. The only time Animal Welfare Act compliance comes up is in fish and wildlife's definition of harass, which is not NMFSA's regulation, but I think if the court wants to look to that for guidance, I think it's fine. I think it's just important to remember that Animal Welfare Act compliance is one of three factors that all must be in place for the exception to be triggered. It also requires that the husband who practiced that issue be generally accepted, and it's strongly disputed here as to whether Lolita's conditions in the smallest orca tank in the world, held by herself for decades, are generally accepted. In addition, it plainly requires that the animal not be put at risk of a likelihood of injury, and we also submit, and indeed the district court found that we had proffered evidence that she is put at a likely risk of injury. In addition, as I have stressed, there are material disputes of fact as to whether the Animal Welfare Act is indeed being complied with. I just would like to very briefly— Are you saying you need a trial, or what are you saying? We are asking for this court to remand for trial because the district— A jury trial, is that what would happen? I believe it would be a bench trial. It would be a bench trial. Yes, Your Honor. So it would be a trial solely on compliance with the ESA? Yes. Because maybe I understood what you were saying, that there's been licensing under the AWA, and there's disputes as to whether that licensing would go forward, and I guess because of the age of this tank, the AWA might be currently noncompliant, but nonetheless licensed. Is that the idea? That is correct, and that would be— If the Animal Welfare Act is deemed relevant, that would be one of the issues to be resolved on a full record below. And I just briefly, if I may, want to go back to the questions that were raised about remedy, and we will provide detailed briefing on the plan to transport her. But I want to reiterate that, as pleaded, the complaint does not require Lolita to be transferred to a CPEN. There are other remedies available, including the permit option and the option for Sequarian to change her conditions. In addition, the plan has been— Permit option? Sorry? I keep calling it the permit option. That is Section 10 of the Endangered Species Act, provides a procedure whereby someone can obtain a permit to keep an animal in otherwise prohibited conditions, and NMFIS discusses that in its listing decision for Lolita. As to the funding, it is true that there was testimony that there is no funding in place yet for Lolita's lifetime care. That is the only thing that was asked about in discovery. The funding for her transport and for the CPEN itself is indeed ready to go. She would be able to have companionship because her family still swims by that area, including, it's believed, her mother. And these sorts of transports have been effectively done with other orcas and dolphins in the past, and this plan is based on established protocols. Okay. I want to go back to the statutory text in the district court's order. So he first deals with the ESA. He says, looking at take, and then he says, take is harm, harass, pursue. You don't have any problem with that, right? No, Your Honor. Okay. And you don't have any problem with some of his statutory analysis. Tell me where you don't have a problem with the words are considered with the company they keep. You don't have any problem with that, do you? We do have a problem with the specific nosoterososis and eschewism generis analysis that's been applied because that exact analysis was rejected by the majority in the Supreme Court decision in Babbitt versus Sweet Home. And, in fact, the district court- Counsel, Sweet Home was what had to do with Chevron deference and a regulatory scheme, didn't it? Yes, Your Honor, it did. But it was interpreting a statute that defined harm under the Endangered Species Act and virtually identical language to the harm prohibition that is at issue here. And the court found that those canons of construction, in fact, cut the other way. And that reading them as my opponent would urge and as the dissent urged in Sweet Home, and, in fact, the district court cites to the dissent repeatedly, sometimes without even acknowledging that she's citing to the dissent, say that that would essentially read terms out of the Endangered Species Act and that Congress, the legislative history makes clear, intended these terms to be construed as broadly as possible. The legislative history, as mentioned by the Babbitt majority, even says birdwatching might be included because it might disturb the birds. Congress intended this to be very broad. Okay. So you use a different definition, or want the court to use a different definition of harm or harass, okay, and say there's enough evidence here. So we have a jury trial on whatever the injury standard is, whether that injury is ongoing. Is that what you're trying to say? Yes. We're asking the court to remand to apply a plain, ordinary meaning of harm and harass. Out of context with capture, kill, and so forth. Its own independent meaning. Its own independent meaning of that. Right. And specifically NIMFAS's regulatory definition of harm, which includes to actually injure an animal. And if the court thinks it's appropriate to look at Fish and Wildlife's definition of harassment and consider animal welfare compliance as one factor, we think that's fine and we nevertheless have material disputes of fact as to whether Lolita is . . . Okay. You've answered my questions and you're over. Judge Flatt, do you have anything else? Thank you. Thank you. The case was well argued on both parts and we appreciate the help. And the court will now take a short recess before we hear the third case of the morning where we have to reconstitute the panel. Court will be in recess.